CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NEAL C. HONG (ILBN 6309265)
Assistant United States Attorney

      60 South Market St., Suite 1200
      San Jose, California 95113
      Telephone: (408) 535-5081
      neal.hong@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-CR-00424 EJD |
| Plaintiff, | THE UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| MARIO JOSE VILLAGRANA, | |
| Defendant. | |

**INTRODUCTION**

The United States respectfully recommends that the Court sentence Defendant, Mario Jose Villagrana, to 168 months of imprisonment followed by 4 years of supervised release.

**ARGUMENT**

**I.**     **The nature and circumstances of Defendant's offenses are very serious.**

Defendant, a convicted felon, possessed multiple firearms, manufactured firearms, and possessed fentanyl with the intent to distribute, all while on parole for being a felon in possession of a firearm. PSR 6-10. On February 15, 2022, law enforcement searched an apartment that Defendant was residing in and found eight firearms, numerous firearm magazines and ammunition, tools to manufacture firearms, 13,439 "M30" pills (fentanyl), and $23,105. *Id*. at 8-10, 16.

A.    *Defendant's firearms possession and manufacturing was particularly dangerous.*

"Congress sought to…keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *United States v. Marzzarella*, 614 F. 3d 85, 93 (3rd Cir. 2010).  Defendant has proven that he is not to be trusted with firearms.  He has criminal convictions for exhibiting a deadly weapon; starting a fire in a social worker's car because "he felt the social worker was not giving him the attention he needed;" carrying a loaded firearm in public in 2016; and again, a year later, but this time with a criminal street gang enhancement and a state felon in possession charge. PSR 28-32.

The types of guns that Defendant possessed were particularly troubling.  He had four semi-automatic rifles[1] (two privately made AR-15-style rifles[2] and two AK-47- style rifles[3]).  PSR 9.  AR-15/AKs are immensely dangerous weapons.  An AR-15 is "the civilian version of the military's M-16." *United States v. Rupp*, 723 F. Supp. 3d 852 (C.D. Cal. March 15, 2024).  An AR-15 "poses an increased danger far beyond that of a handgun—with its combination of lethality and rapid-fire capability allowing a shooter to kill dozens of people within a matter of seconds." *Id*. at 853.

Indeed, AR-15 style rifles were often used in our nation's most horrendous mass shootings.  *See id*. at 841 (acknowledging California's Assault Weapons Control Act was in response "after a shooter used an AK-47 to kill five schoolchildren and injure 32 others at an elementary school in Stockton, California"); *New York State Rifle and Pistol Association, Inc. v. Cuomo*, 804 F.3d 242, 248 (2nd Cir. 2015) ("On December 14, 2012, a gunman shot his way into Sandy Hook Elementary School in Newtown, Connecticut and murdered twenty first-graders and six adults using *a semiautomatic AR–15– type rifle with ten large-capacity magazines*.") (emphasis added); *Vegas gunman Stephen Paddock inspired by criminal father's reputation* (Jan. 29, 2019), https://www.nbcnews.com/storyline/las-vegas-shooting/vegas-gunman-stephen-paddock-inspired-criminal-father-s-reputation-n964066. ("Paddock

---

[1] The PSR does not state whether the AR-15 or the AKs were semiautomatic; however, this is the distinguishing feature of an AR-15.  *See United States v. Rupp*, 723 F. Supp. 3d 837, 852-853 (C.D. Cal. March 15, 2024) ("the AR-15 fires only in semiautomatic mode").

[2] AR is short for assault rifle.  *See United States v. Rupp*, 723 F. Supp. 3d 837 (C.D. Cal. March 15, 2024).

[3] AK is short for Avtomat Kalashnikova (Russian for "automatic Kalashnikov).  *See* https://www.britannica.com/technology/AK-47.  An AK is a Soviet era assault rifle.  *Id*.

used *assault-style rifles* to fire more than 1,000 rounds in 11 minutes into the crowd of 22,000 music

fans. Most of the rifles were fitted with rapid-fire 'bump stock' devices and *high-capacity magazines*.")

(emphasis added).  Unfortunately, it is now common to hear that an assault rifle was involved in a public

tragedy because of "the disproportionate use of assault rifles in mass shootings." *See Rupp*, 723 F.

Supp. 3d 856.

The Government emphasized large/high-capacity magazines above because Defendant also

possessed "a 30-round extended magazine."[4]  PSR 9.  Large/high-capacity magazines make an already

lethal instrument even more dangerous because "large-capacity magazines results in more gunshots

fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries."  *Fyock*

*v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015).  Moreover, "large-capacity magazines tend to pose a

danger to innocent people and particularly to police officers."  *Heller v. District of Columbia*, 670 F.3d

1244, 1264 (D.C. Cir. 2011).

That extended magazine was attached to a Glock pistol fitted with a switch, which enabled the

Glock to fire fully automatically.  *See* PSR 9.  This effectively turned the pistol into a machinegun.

Machineguns are "inherently dangerous" because it is "primarily [a weapon] of war and [has] no

appropriate sporting use or use for personal protection."  *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir.

2016).

Lastly, Defendant possessed and manufactured privately manufactured firearms (PMF), PSR 2,

widely known as, "ghost guns."  *See United States v. Decoteau*, 525 F. Supp. 3d 268, 270 (D. Mass.

2021) ("ghost guns—guns 'made from partially built frames, which are drilled and assembled into fully

operational guns, thus evading serializing, registration, and purchasing regulations.'").  PMFs "are

called 'ghost guns' because they are typically sold and assembled without serial numbers, making them

untraceable."  *Ghost Guns* (April 6, 2022), https://giffords.org/lawcenter/gun-laws/policy-

areas/hardware-ammunition/ghost-guns/.

The unregulated sale of untraceable firearms is acutely dangerous because it caters to "people

who know they would fail a background check to purchase a firearm, including underage minors."

---

[4] The U.S.S.G. considers a firearm magazine to be a large capacity magazine if it accepts more than 15 rounds of ammunition.  U.S.S.G. § 2K2.1, note 2.

*Ghost Guns*.  Among this group are felons, gang members, and drug traffickers.  *See United States v. Cavera*, 550 F.3d 180, 204 (2nd Cir. 2008) (Raggi, J., concurring) (recognizing guns as tools-of-the-trade for organized crime families, numerous large-scale narcotics enterprises, and street gangs); *see also United States v. Carrasco*, 257 F.3d 1045, 1048 (9th Cir. 2001) ("Firearms are known tools of the trade of narcotics dealing because of the danger inherent in that line of work.").

Indeed, "[l]aw enforcement recovered and traced more than twice as many PMFs at crime scenes in 2022 and 2023 as they did in the five years between 2017 and 2021 combined."  *Ghost Guns*.  "In total, between 2017 and 2023, 92,702 suspected PMFs were recovered at crime scenes and traced by ATF."  *Id*.  In 2019, ghost guns represented 30% of all crime guns recovered in California.  *Memo: The Dangers of Ghost Guns* (November 22, 2019), https://giffords.org/press-release/2019/11/memo-the-dangers-of-ghost-guns/.  Defendant's conduct contributed to the spread of these dangerous weapons, thus warrants deep consideration from the Court.  Defendant's possession with intent to distribute fentanyl should equally trouble the Court.

        B.       *The sale of fentanyl is extremely dangerous.*

Defendant possessed 1,445.6 grams (1.45 kilograms) of fentanyl with the intent to distribute. PSR 16.  It is reasonable to assume that Defendant was successful with this intent because law enforcement recovered $23,105 from him.  Fentanyl is an "an exceptionally dangerous drug."  *United States v. Wilson*, NO. 2:24-cr-00093-LK, 2024 WL 3950434 at *5 (W.D. Wash. August 27, 2024); *see also United States v. Taylor*, 449 F. Supp. 3d 668, 673 (E.D. Ky. 2020) ("[i]t is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater"); *United States v. Coley*, No. 2:23-cr-92, 2023 WL 3271146, at *3 (M.D. Ala. May 5, 2023) ( "the dangerousness of fentanyl is exceptional, even when compared to other exceptionally dangerous drugs"); *United States v. Brown*, 538 F. Supp. 3d 154, 170 (D.D.C. 2021) ("a dose of just two milligrams of fentanyl is lethal").

"According to the CDC, fentanyl is up to 50 times stronger than heroin and 100 times stronger than morphine."  *Id*. at note 4.  "In California, over 10,000 people died from all-drug overdoses from October 2020 to September 2021. This was a 70% increase from the annual rate in September 2019. Fentanyl accounted for 53% of these overdose deaths, an increase of 316% from the annual rate in

September 2019." California Response to the Overdose Crisis (publication date unknown) p. 1, https://californiaopioidresponse.org/wpcontent/uploads/2020/05/MAT_Flyers_DHCS_Opioid_Crisis. pdf.

Individually, Defendant's drug offense and firearms offenses are alarming.  But these offenses did not occur in isolation—he possessed these dangerous items together. "[N]umerous courts have recognized, guns and drugs are a 'dangerous combination,' and drug-traffickers are "'dangerous and disruptive to society.'"  *United States v. Canales*, 702 F.Supp.3d 322, 329 (E.D. Pa. November 20, 2023); *see also Orrego-Goez v. United States*, 656 F. Supp 3d. 1370, 1377 (S.D. Fla. February 16, 2023) ("Guns and drugs 'are a dangerous combination'—as courts across the country have consistently found."); *United States v. Beauchamp*, 23-12-SDD-SDJ, 2025 WL 1194490 at *4 (M.D. La. April 24, 2025) ("Congress has long recognized 'that drugs and guns are a dangerous combination.'"). Accordingly, the Court should impose a significant sentence to address the serious nature of Defendant's offenses.

**II.     Defendant's history and characteristics, the need for deterrence, and the need to protect the public from further crimes of the defendant gravitate towards a high sentence.**

Defendant received his first criminal conviction at the age of 18 and has since continued to commit crimes.  PSR 1-8, 28-32.  According to the PSR, on July 28, 2013, Defendant was involved in an incident with a knife.  PSR 28.  He received 3 years' probation and 121 days in jail for this offense. *Id*.  Approximately one month later, he committed another offense, this time setting fire to a car because he felt like he was not getting the attention that he needed from a social worker.  *Id*. at 29.  He received another jail sentence and his probation was revoked.  *Id*.  Undeterred, Defendant carried a loaded shotgun in public in 2016.  PSR at 31.  According to the PSR, at that time, law enforcement believed Defendant was a member of the notorious *Norteno* gang.  *Id*.  For this offense, he was sentenced to 121 days in jail and placed on probation for 3 years.  Less than a year later, he again possessed a firearm and was seen by law enforcement with *Norteno* gang members.[5]  *Id*.  He was sentenced to 4 years in prison

---

[5] It is unclear if Defendant is still an active gang member.  If he is, that would make recidivism even more likely given his criminal history.  He has a tattoo on his neck of the letters "STK."  PSR 50. "Upon the advice of defense counsel, the defendant declined to comment on whether his tattoo was gang affiliated."  *Id*.  Although Defendant never admits to currently being a gang member, he also does not

1  for this offense.  *Id.*

2       Defendant was paroled on September 18, 2019.  *Id.*  On February 15, 2022, while on parole,

3  Defendant committed the instant offenses.  PSR 8.  Defendant has demonstrated that he lacks respect for

4  the law because he has failed to control his criminal behavior, and even more troubling, appears to be

5  escalating the severity of this behavior.  He started with misdemeanors, then to graduate to committing

6  felonies involving firearms, and now he not only possessed firearms—but he is manufacturing them and

7  selling a dangerously addictive drug.

8       A 168-month sentence would serve as deterrence and protect the public from further crimes of

9  Defendant.  Courts have imposed increasingly longer sentences for defendant that have been undeterred

10  by prior sentences.  *See United States v. Rosales-Gonzales*, 801 F.3d 1177, 1184-85 (9th Cir. 2015)

11  (affirming a district court's upper-end guidelines sentence based on, *inter alia*, defendant being

12  undeterred by past sentences);  *United States v. Schlisser*, 767 F. App'x 69, 72 (2nd Cir. 2019)

13  (unpublished) (rejecting a substantive reasonableness challenge to an 84-month sentence based, in part,

14  on the fact that "the 60-month sentence [defendant] served for his prior crime apparently did not deter

15  him from committing the present offense"); *United States v. Torres*, 274 F. App'x 41, 42 (2nd Cir. 2008)

16  (unpublished) (rejecting reasonableness challenge to a 12-year sentence because, among other things,

17  "after considering the fact that [defendant's] two prior sentences of three-to-six years failed to deter him,

18  the district court concluded that a longer period of incarceration was necessary to achieve the statutory

19  goals of sentencing").

20       **III.     United States Probation's recommendation for a 98-month variance is not**

21  **supported by the record.**

22        United States Probation recommends a sentence of 70 months, which is a massive 58 percent

23  variance (98 month variance) from the low-end of the Guidelines (168 months).  Probation based this

24  recommendation on Defendant's childhood experiences, being a victim of physical abuse, having

25  learning challenges, and completing educational opportunities while in custody.  PSR Sentencing

26  Recommendation (PSR Sent. Rec.) p. 2.  These bases do not substantially outweigh the fact that "[t]he

27

28  _____
state whether he has dropped out.

1    underlying offense is gravely concerning as [Defendant] was on parole supervision at the time of the

2    offense. He was in possession of dangerous drugs and deadly weapons, both which are harmful to the

3    community and can cause death to others." *Id*.

4        The Government recognizes that Defendant had periods of instability and difficulties, but they do

5    not justify such a large degree of a variance. Defendant's biological parents were not a part of his life.

6    PSR 44. Yet, he had support from other members of his family. PSR 45. His grandmother was "loving

7    and caring and provided basic necessities including food, clothing, and shelter." *Id*. Tragically,

8    Defendant's grandmother passed away from a bacterial infection. *Id*. Defendant was then cared for

9    briefly by his mother, and then by his aunt and uncle. *Id*.

10        It was with his aunt and uncle where he learned discipline. Defendant told Probation that "It was

11    extremely controlled and I was not used to it because I did what I wanted and went wherever I wanted

12    when I lived at my grandma's. *Id*. My aunt had house rules and I struggled with listening." Discipline

13    is precisely what Defendant needed in his life because not following rules and doing whatever he

14    pleased is the reason for his issues with the law.

15        Defendant acknowledged that his "aunt taught [him] everything." "She taught [him] how to tie

16    [his] shoe and how to read. *Id*. She spent hours teaching him how to read. *Id*. Defendant recognized

17    that "She honestly taught me everything I needed to know and I need to thank her." *Id*. Although his

18    relationship with his uncle was different, Defendant still acknowledged that his relationship "was good."

19    Defendant's uncle "was a very good person" that "treated [Defendant] and [his] brother as his kids

20    despite his uncle's own struggles with alcohol and other substances…." *Id*.

21        Eventually, his uncle and aunt separated, and Defendant had to live with his brother. PSR 46.

22    This did not last and long and Defendant has been in and out of jail since then. *Id*. It is likely that

23    Defendant's family instability contributed to his behavior, but it should be noted by the Court that he has

24    eight siblings, and the four that he has contact with are not habitual criminal offenders. His brother, MV

25    (age 32), resides in Marina, California, and works as a school basketball coach. His brother, EV (age

26    32), resides in Marina, California, and works as a welder. His maternal half-brother, AG (age 26),

27    resides in Seaside, California, and works as a painter. His maternal half-brother, RG (age 24), resides in

28    Marina, California, and works in construction. PSR 44.

Probation's other bases, physical abuse and having learning challenges, are also not justifications for such a large downward variance.  "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  U.S.S.G. §5H1.3.  The Ninth Circuit has "held that this section includes the impact of childhood abuse on the offender." *See United States v. Roe*, 976 F.2d 1216, 1218 (9th Cir.1992).  Probation does not recommend this specific departure; however, the Government submits that this section offers the Court some guidance on how it should consider a defendant's childhood abuse.

The PSR states that his mother was "physically abusive and often beat him using a belt, fly swatter, an extension cable, spatula, or with a shoe."  PSR 54.  This is unfortunate; however, "[his]mother was not involved in his upbringing and she occasionally appeared during the holidays and on his birthdays."  PSR 45.  Indeed, most of his childhood was spent with his loving grandmother, aunt and uncle.  *Id*.  Furthermore, Probation provided an Adverse Childhood Experiences (ACEs) assessment to Defendant at the time of the presentence interview.  PSR 56.  "ACEs consists of ten questions that evaluates traumatic events involving abuse, neglect, and household dysfunction that occur during childhood (prior to age 18)."  *Id*. Defendant did not complete the assessment. *Id*.

There are not enough facts present to distinguish this case from typical cases to an unusual degree.  Defendant did have mental and learning challenges, but due to his aunt's care and his treatment, Defendant "no longer receives psychotropic medication and manages his mental health from what he has learned from therapy."  PSR 53.  Additionally, even if he currently struggles with dyslexia, bi-polar, and anxiety, that is not a justification for manufacturing guns and selling fentanyl.

Probation and the Government recognizes that Defendant "managed to complete his education and earned his high school diploma. He has also utilized the time he spent incarcerated focusing on education and vocational training to prepare for his future."  PSR Sent. Rec. P. 2.  This should be commended.  This Court has the unique and difficult task to determine what is a just and appropriate sentence is in this case.  Perhaps the Court may find that a downward variance is warranted.  However, the Government submits that the 98 month-downward variance that Probation recommends is not supported by the factors set forth in 18 U.S.C. § 3553(a).

8

**CONCLUSION**

Accordingly, for the reasons stated above, the Government respectfully recommends that the Court sentence Defendant to 168 months of imprisonment.  If the Court determines that a downward variance is appropriate, the Court should not vary to the degree that is recommended by Probation. The Government also recommends that Defendant be placed on a term of 4 years of supervised release.


DATED: July 7, 2025

                                        Respectfully submitted,

                                        CRAIG H. MISSAKIAN
                                        United States Attorney


                                        /s Neal Hong
                                        NEAL C. HONG
                                        Assistant United States Attorney